IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| RICHARD GARNER FRAUNFELDER, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 06-0256-CG-M |
| ) | |
| CITY OF MOBILE, ALABAMA, ) | |
| ) | |
|     Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

This cause is before the court on the motion of defendant, City of Mobile, for summary judgment (Doc. 38), plaintiff's responses thereto (Docs. 43, 44, 48, 49, 50, 52, 53, 54, 56, 57, 58), and defendant's reply (Doc. 59). The court finds that plaintiff has not shown that he suffered a constitutional injury or that his injury was caused by a policy, statement, ordinance, regulation or decision of the City of Mobile. Therefore, defendant's motion for summary judgment is due to be **GRANTED.**

**FACTS**

This case arises from plaintiff's arrest following a domestic dispute. The complaint asserts a claim under 42 U.S.C. 1983 against the City of Mobile. Specifically, the complaint alleges that the "City of Mobile has tolerated a pattern or practice of excessive force, false arrests and illegal searches and seizures by its police department..." (Doc. 1, p. 2). The complaint alleges that on April 23, 2004, plaintiff called the Mobile Police Department for assistance with "his hysterical co-parent, Jennifer Dycus." (Id. at p. 3). The complaint alleges that the police arrived and engaged in misconduct by macing plaintiff's dog, refusing to leave the premises, trespassing,

macing plaintiff and his child, shooting plaintiff with a taser gun, and falsely arresting plaintiff. (Id.).

According to the officers at the scene, Officer Green and Officer Ramos, they received a dispatch call regarding a domestic violence incident at 5857 Shadesview Drive in Mobile, Alabama. (Green Affid. ¶ 3). Plaintiff submitted the affidavit of Ms. Dycus, which confirms that plaintiff called the police on that date seeking advice and that Ms. Dycus also called the police, stating that plaintiff "pushed her several times and she was wanting to leave with their infant daughter but was not being allowed to leave." (Dycus Affid. ¶ 3).

Upon arriving at the house, the officers identified Jennifer Dycus and the plaintiff and attempted to gain access to the house when plaintiff let out a large dog that appeared to be a Rottweiler. (Green Affid. ¶¶ 3, 4). Ms. Dycus reports that she told plaintiff to put the dog up, but that "plaintiff said no and so Jennifer Dycus put the dog, a Rottweiler, on a runner in the back yard." (Dycus Affid. ¶ 5). The officers report that they were concerned for their safety and sprayed the dog with pepper spray. (Green Affid. ¶ 4). According to Dycus, the dog was not a threat to the officers because he was attached to a metal line and could not reach the officers - that the dog could only "reach one-third to one-half the width inside the carport" where the officers stood. (Dycus Affid. ¶¶ 6, 7, 8). The plaintiff, Dycus, and their infant reportedly began coughing and their eyes and throat began burning from the pepper spray. (Dycus Affid. ¶ 8).

The officers report that Dycus informed them about the domestic violence incident and told them that the plaintiff yanked her arm and shoved her during an argument. (Green Affid.¶ 5, Ex. A). Ms. Dycus reports that she signed a form and circled on two diagrams "where the plaintiff had placed his hands when he pushed her towards the door to leave/exit the bedroom,"

but that the forms were otherwise blank and that at no time did she tell the officers that the plaintiff "yanked her arm and shoved her." (Dycus Affid. ¶¶ 14, 16). According to Dycus, she told the officers that she and the plaintiff "had a minor argument" and that she had "attempted to take her daughter but was pushed (non-violently) several times towards the bed room door and was told to leave." (Dycus Affid. ¶ 14(a)). At that time, the plaintiff had retreated into the house with the infant. (Green Affid. ¶ 5). According to Ms. Dycus, plaintiff took the infant to a back bedroom, opened windows to air out the house and called 911 for assistance with the infant because she had been exposed to the pepper spray. (Dycus Affid. ¶¶ 11, 12).

      The officers entered the residence to attempt to arrest plaintiff. (Green Affid. ¶ 7). According to the officers report, plaintiff started cussing at them and telling them to get out of the house. (Green Affid. ¶ 7). The officers also report that plaintiff was holding a metal handled broom and acting in an aggressive manner. (Green Affid. ¶ 7). Ms. Dycus denies that plaintiff used a metal broom in an aggressive manner. (Dycus Affid. ¶ 19). The officers report that they told plaintiff to drop the broom and come to the officers, but that the plaintiff refused. (Green Affid. ¶ 7). The officers report that for their own safety, they used a taser to subdue the plaintiff. (Green Affid. ¶ 7). However, the plaintiff reports that the officer stated "you can come the easy way or the hard way" and upon seeing plaintiff, fired a taser at him. (Doc. 56). Plaintiff states that the taser incident occurred as follows:

> After noticing the taser gun aimed at him in the hallway, in order to shield himself from the taser gun, the plaintiff attempted to grab laundry from a very large, towering, laundry pile, besides himself in the hallway. Plaintiff was staring directly at the officer's gun pointed directly at him and did not veer or look away from the gun or change his position as plaintiff grabbed for a laundry item to shield himself with.
> Before plaintiff realized what he had in his hand, plaintiff had already been shot with the taser projectile electrodes. Plaintiff remembers his arms being erect

>and directly in front of him, away from his body, intensely grasping the mini-(grey or blue/grey)-broom handle, with both right and left hands, as his arms were electrified because the taser-darts had lodged in both the left and right pectoral muscles.
>
>>Plaintiff's arms and chest were intensely electrified
>>The officer shocked plaintiff's body for approximately eighteen (18)
>
>seconds. (40:00-40:18) During this time period, plaintiff states the words, ow ow help help stop stop please please stop.
>>After tasing him for several seconds, at (40:17) the officer said 'Drop the broom'. Plaintiff immediately replied, "I can't I can't"
>>At (40:21) the officer states, "Don't move or I'll light you ass up."

(Doc. 56, pp. 7-8) (all caps were used in original).

Plaintiff also submitted a video tape of a portion of the incident, which the court has reviewed. The video actually shows very little visually as most of it was taken in a dark room and, except for a few images of windows and blurred images of the fire and rescue personnel who checked on the infant, is mostly a black screen with audio. The video camera was apparently attached to the plaintiff. On the video you can hear the plaintiff and an upset lady (presumably Ms. Dycus) arguing after the pepper spray incident with the dog. The tape indicates that the plaintiff calls for emergency help for his infant (although the baby does not sound distressed or even upset). It then sounds like an officer or officers come into the room (plaintiff tells them they can come in) and asks the plaintiff what is going on with him and his wife or girlfriend. The plaintiff does not respond to the officer's question and asks who sprayed the pepper spray. One of the officers responds affirmatively and the plaintiff and the officer then argue over whether the dog was a threat and should have been sprayed. Both the officer and the plaintiff yell and curse during this conversation and plaintiff tells the officer to get out of his house. Later an upset lady is again heard and she and the plaintiff argue. The rescue personnel eventually arrive and take the baby through the window and say she looks fine. Plaintiff is asked repeatedly to come out and

talk to the officers but he continues to stay in the house and says he will not come out because if he does they will arrest him. An officer tells him (presumably through a window) that if he is not going to come out that they will come in and get him. The officer says something about domestic violence and about him coming out to talk to them. The plaintiff appears to respond by running through the house closing windows and doors. While plaintiff is running through the house, you hear someone say "we can do this the hard way or the easy way." The plaintiff says "get the fuck out of my house" and it sounds like an officer then says "don't move." The next sounds appear to be the plaintiff being shot with the taser. While plaintiff is pleading for them to stop, an officer can be heard telling the plaintiff not to move and to drop the broom. The plaintiff says "I can't" and then it sounds like the taser stops. An officer then says "don't move or I'll light your ass up again." (Doc. 54).

All City of Mobile Police Officers receive training regarding arrests and the appropriate use of force in making arrests. (Green Affid. ¶ 2).

## LEGAL ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment;

there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e)  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

"[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

**B. Claims of Excessive Force and Wrongful Arrest**

In order to state a claim under § 1983 against the City of Mobile, plaintiff must allege that he suffered a constitutional injury, and that his injury was caused by "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dept. of Soc. Servs., 436 U.S. 658, 690 (1978).

**1. Constitutional Injury**

Under the Fourth Amendment, an individual has a right to be free from "unreasonable searches and seizures." In Fourth Amendment terminology, an arrest is a seizure of the person, California v. Hodari D., 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), and the "reasonableness" of an arrest is determined by the presence or absence of probable cause for the arrest. The existence of probable cause at the time of arrest constitutes an absolute bar to a § 1983 action for false arrest. Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004). "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam) (quotation marks omitted). This probable cause standard is practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances. See Maryland v. Pringle, 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). An officer is not automatically liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause. As the Supreme Court observed in Anderson v.

Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials ... should not be held personally liable." Thus, even if the court determines that the officers did not in fact have probable cause, the standard to be applied is that of "arguable probable cause," that is, whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[s] could have believed that probable cause existed to arrest." Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002) (quoting Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001)). This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who unreasonably conclude that probable cause exists.

In this case, the police officers had probable cause to arrest plaintiff. The officers had received a call from the dispatcher relating to a domestic violence incident at plaintiff's residence and upon arriving at the locality were informed by Jennifer Dycus that the plaintiff had pushed her during an argument. Plaintiff disputes that Dycus told the officers that plaintiff "yanked" her arm, but admits that she told them that he pushed her several times. Dycus even circled on two diagrams where the plaintiff had placed his hands when he pushed her. According to the officer, plaintiff was acting in an aggressive manner and was uncooperative when they attempted to arrest him. The video evidence submitted by plaintiff shows that the plaintiff had shouted and cursed at the officers and was uncooperative. Under the circumstances, the court finds that a reasonable officer could have believed that probable cause existed to arrest plaintiff.

The court finds that plaintiff has also not shown that excessive force was used during his arrest. Under the Fourth Amendment, officers may only use such force as is "objectively reasonable" under the circumstances. Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Supreme Court described the "objectively reasonable" standard to be applied in such excessive force cases as follows:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' " against the countervailing governmental interests at stake. Id., at 8, 105 S.Ct., at 1699, quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. See Terry v. Ohio, 392 U.S.[1], at 22-27 [(U.S. Ohio 1968)], 88 S.Ct. [1868], at 1880-1883 [(1968)]. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. See Tennessee v. Garner, 471 U.S. [1], at 8-9 [(1985)], 105 S.Ct.[1694], at 1699-1700 [(1985)] (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure").
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. See Terry v. Ohio, supra, 392 U.S., at 20-22, 88 S.Ct., at 1879-1881. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," Johnson v. Glick, 481 F.2d [1028], at 1033 [(2d Cir. 1973)], violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See Scott v. United States, 436 U.S. 128, 137-139, 98 S.Ct. 1717, 1723-1724, 56 L.Ed.2d 168 (1978); see also Terry v. Ohio, supra, 392 U.S., at 21, 88 S.Ct., at 1879 (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. See Scott v. United States, supra, 436 U.S., at 138, 98 S.Ct., at 1723, citing United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

Graham, 490 U.S. at 396-397, 109 S.Ct. at 1871-1872. "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand" Lee v. Ferraro, 284 F.3d 1188,

9

1197 (11th Cir. 2002) (internal quotation marks omitted). "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." Saucier, 533 U.S. at 205.

In this case, the plaintiff asserts that the officers used excessive force when they shot him with a taser. Plaintiff contends that he merely grabbed at a pile of laundry in an attempt to shield himself from the officers. Plaintiff grabbed what he describes as a mini-broom. However, as discussed above, the plaintiff had shouted and cursed at the officers and the officers had probable cause to believe that plaintiff had committed a crime. The plaintiff had refused to come out and talk to them about the domestic violence incident and his erratic behavior would have raised concern for the safety of the officers who were attempting to arrest him. At the time he was tasered, the plaintiff was apparently coming towards the officers through a hallway and grabbed at something beside him. Under the circumstances, the court finds it was reasonable to use the non-deadly force of a taser to restrain the plaintiff.

**2. Cause of Injury**

Moreover, even if plaintiff suffered a constitutional injury, a municipality cannot be held liable under §1983 solely because it employs a tortfeasor. Id. at 2035. In Board of the County Commissioners of Bryan County v. Brown, 520 U.S. 397, 117 S.Ct. 1382 (1997), the test set out above by Monell was subsequently narrowed by the Supreme Court when it stated:

> [I]t is not enough for a § 1983 plaintiff to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Brown, 520 U.S. at 404, 117 S.Ct. at 1388. The plaintiff's burden is heavy. As noted by the Eleventh Circuit Court of Appeals:

> This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability-a result never intended by section 1983. As the Supreme Court has explained, '[t]o adopt lesser standards of fault and causation would open

>municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in de facto respondeat superior liability on municipalities ....' " (citing City of Canton [v. Harris], 109 S.Ct. [1197] at 1206 [(1989)]); see also Brown, [520 U.S.] at 415-16, 117 S.Ct. at 1394 ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.").

Gold v. City of Miami, 151 F.3d 1346, 1351 n. 10 (11th Cir. 1998).  Under § 1983, the "requisite degree of culpability" is that the municipality acted with at least "deliberate indifference" to the consequences of its actions.  For instance, evidence concerning an applicant's background may have made a person a poor candidate for an officer; but nevertheless, the municipality cannot be held liable for deliberate indifference unless the plaintiff demonstrates that the decision to hire reflected a conscious disregard for a high risk that the officer would use excessive force in violation of the plaintiff's federally protected right. Brown, 520 U.S. at 414.  Plaintiff must show not only that the municipal officers violated his constitutional rights, but that the City of Mobile's policies were the "moving force" behind his injury.

 To show an unconstitutional policy or custom, plaintiffs must identify the policy or custom, connect the policy or custom with the government entity itself, and show that the particular injury was incurred because of the execution of that policy. Bennett v. City of Slidell, 728 F.2d 762, 767 (5th Cir. 1984)(en banc).  Thus, the City of Mobile is not automatically liable under § 1983 even if it inadequately hired, trained or supervised its police officers and those officers violated plaintiff's constitutional rights.  If plaintiffs fail to allege an official policy or custom, then their claim against the municipality is subject to dismissal. See Meadowbriar Home for Children, Inc. v. Gunn, 81 F.3d 521, 532-33 (5th Cir. 1996).  Moreover, the Eleventh Circuit has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise. Church v. City of Huntsville, 30 F.3d 1332, 1342-46 (11th Cir. 1994), (holding that the plaintiffs were not likely to succeed on the merits of their failure-to-train claim without proof that the City was aware of a prior incident in

which constitutional rights were similarly violated); see also Popham v. City of Talladega, 908 F.2d 1561, 1564-65 (11th Cir. 1990) (finding no liability for failure to train when no pattern of incidents put the City on notice of a need to train).  To maintain a claim for inadequate training, plaintiff must show "some evidence of a pattern of improper training to sustain [his] claim, and [he] must show that [the city] was aware of the deficiencies in the program." See Mercado v. City of Orlando, 407 F.3d 1152, 1161 (11th Cir. 2005) (citing City of Canton v. Harris, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

In this case, plaintiff alleged that the City of Mobile has a pattern or practice of excessive force, false arrests and illegal searches and seizures by its police department.  However, plaintiff offered no evidence to support this contention except for the alleged excessive force and wrongful arrest complained of in this particular case.   Plaintiff does not identify any specific policies or customs promulgated by the City of Mobile or the Mobile Police Department.   Plaintiff has also failed to establish that any municipal policy or custom was the "moving force" behind any alleged constitutional violation.  Nor has plaintiff shown that the claimed injuries are plainly obvious consequences of the City of Mobile's hiring, supervision, or training decisions or that the City of Mobile was aware of the deficiencies in the program.   Therefore, the court finds that plaintiff has failed to state a § 1983 claim against the City of Mobile.

## CONCLUSION

For the reasons stated above, the motion of the City of Mobile for summary judgment (Doc. 38) is **GRANTED**.

**DONE and ORDERED** this 4th day of January, 2008.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE